Toledo **MASSEY** and **Fernando Burnette,**
Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 22884.

United States Court of Appeals
Ninth Circuit.

Feb. 20, 1969.

Daniel K. Lamont, Tucson, Ariz., for Toledo Massey.

Maurice Stern, Tucson, Ariz., for Fernando Burnette.

Edward E. Davis, U. S. Atty., Jo Ann D. Diamos, Rubin Salter, Jr., Asst. U. S. Attys., Tucson, Ariz., for appellee.

Before MERRILL and BROWNING, Circuit Judges, and STEPHENS, District Judge.

STEPHENS, District Judge:

This is an appeal from the judgment and conviction in the United States District Court for a violation of 18 U.S.C. § 1153, rape on Indian Reservation. The United States District Court has jurisdiction pursuant to 18 U.S.C. § 3231, and this Court has jurisdiction under the provisions of 28 U.S.C. § 1291.

The prosecutrix, Evangeline Gatewood, age 17, and the appellants are members of the White Mountain Apache Indian Tribe and all the acts in question occurred within the boundaries of the Fort Apache Indian Reservation in the District of Arizona.

There are conflicts in the evidence, but in considering this appeal, the Court must accept the evidence which supports the jury verdict and is most favorable to the prosecution's case. Briefly stated, the facts are as follows:

On Saturday, the 22nd day of October, 1967, Evangeline Gatewood and her grandmother went to the town of White River. They spent the day in town and became separated. Late in the evening, Evangeline went to the Apache Flame

Bar to find her grandmother. Being unable to find her, she decided to request Toledo Massey to take her home. She testified that she looked to Toledo to take her home because Toledo's wife is related to Evangeline's father. She thought that they were cousins. While awaiting an opportunity to be taken home, she encountered Fernando Burnette at the car owned by Toledo Massey. She and Fernando got into the car. She was seated in the front seat next to the passenger window and Fernando was seated next to her. She was afraid of Fernando, whom she had never met before, but did not leave the car because she wanted Toledo to take her home. Finally, late at night, Fernando, Toledo and David Edwards agreed to take her home. Instead, they took a route which was not directly to her home but down a side road by the river at Fort Apache.

They listened to the radio for a while and drank some beer which they passed around. Evangeline did not drink any of it. Fernando told her to open the door so he could get out of the car. She asked him why and received no reply. Then he forced her to open the door and while both of them were standing close to the door of the car, Toledo got out, grabbed her by the shoulder and started walking with her away from the car. She asked where they were going, but did not receive an answer. She became frightened and started to run. Toledo caught up with her and threw her down on the ground under a walnut tree. She fought him by kicking him and by scratching his face and hitting him with her hands. Toledo twisted her knee, causing a painful injury which was severe enough to prevent her from being able to walk. Toledo then raised her skirt and tore it, tore off her panties and raped her. She screamed for help and the other two boys came up, but instead of helping Evangeline, they assisted Toledo by holding her arms so that she was unable to continue to fight.

When Toledo had finished his act of intercourse, he and David Edwards helped hold Evangeline down and Fernan-

do proceeded to rape her, followed then by David and again by Toledo and again by Fernando. They then carried her to the car, drove her to a place on the road approximately 150 yards from her father's home and put her out of the car. She was unable to walk, but crawled under a barbed wire fence toward her home. She commenced to scream and call her father's name and he eventually found her. He brought her to the home and put her on the bed and called the police. Evangeline told him that she had been raped by the three boys.

When the police arrived, they took her to the hospital. She was hospitalized for 22 days. The latter part of the time she was in a wheel chair because of the injury to her leg.

The examining doctor testified to her physical injuries and her appearance at the time of admission. She was visibly in pain, complained about the injury to her leg and she was crying. She was given a physical examination which included a pelvic examination. The examination disclosed that she had had sexual intercourse and that the external genitalia of the patient revealed "abrasions and tearing of the muscosa of the skin about the introitus and tearing of the hymenal ring." The tearing of the hymenal ring was recent. In addition, she had contusions and abrasions on both lower extremities and was unable to walk because of weakness of the ligaments of the inner aspect of her knee. The doctor testified that it was not likely that the sexual intercourse was voluntary. Even some of the testimony of Toledo supports the conclusion that the intercourse was forcible rape. He testified that he was holding Evangeline's hand on one side and as soon as Fernando got on her, he let her hand go. When asked why he was holding her hand, he replied, "Because I wanted Fernando to get on her good."

On cross-examination, Evangeline was asked about one Sherman Wool. She testified that he was a little older than she was, she had seen him four times the previous summer and then the examination to determine whether she had ever

gone out with Sherman Wool was completely inconclusive.[1] It is impossible to tell from the questions and answers whether she went out with him or not.

The defense offered the testimony of Althea Hastings who was a nurse at the hospital while Evangeline was recovering. She testified that Evangeline said to her, "I stayed with Sherman Wool. We went to movies together and we went to places together." An objection to this statement was sustained. The testimony was stricken and the jury instructed to disregard it. The objection was that impeachment cannot be based upon immaterial matter.

A second question was asked:

"Q. Did she say she lived with Sherman Wool?

"A. Yes."

The motion to strike this answer on the same ground was granted, the court saying that the statement was equivocal and didn't have anything probative in it in the area in which the examination was going and it was ordered stricken on the basis that it was an equivocal statement.

■ Appellants argue that the stricken testimony constituted evidence of prior acts of unchastity and that it was admissible for the purpose of impeachment. The sole question on appeal is whether it was reversible error for the trial court to exclude this testimony of Althea Hastings as to Evangeline's prior statements.

Evangeline's prior out-of-court statements to Althea were not admissible as proof of the facts they recited, for these statements were hearsay. They were not admissible for the limited purpose of impeaching Evangeline, for the necessary foundation for such use was not laid since Evangeline was not asked on cross-examination whether she had made the prior out-of-court statements attributed to her by Althea.

Aside from the fact that Evangeline's asserted statement that she had lived with Sherman Wool was inadmissible hearsay, its probative value was highly questionable. Its substance came from the mouth of counsel who should not have led the witness in an area which he considered highly sensitive. Whether or not the statement was equivocal depends upon the surrounding circumstances. The two people involved were both young people of an age when in the normal course both would be "living with" some adult. At the time of the incident in question, Evangeline was living with her father. Without any explanation in the record that at the unspecified time when Evangeline was said to have lived with Sherman Wool, he and she were not also living with responsible adults, it is highly questionable as to whether the jury would be entitled to draw the inference that the situation involved a lack of chastity.

Furthermore, it should be noted that the court observed that the statement didn't have anything probative in it in the area in which the examination was going. Doubtlessly, the court had in mind the probative value of the assertion in the context of the evidence which exposed acts of intercourse which would be rape unless each was with the consent of Evangeline. Evidence which would at best give rise to a permissible infer-

---

1. Referring to Sherman Wool, the interrogation went as follows:

"Q How many times did you see him last summer?

"A Four times.

"Q Did you go out with him?

"A No.

"Q Never went out with him?

"A Yes."

The next question was withdrawn and reframed after objection and the examination continued as follows:

"Q (By Mr. Stern) Evangeline, I understand your last answer you told me, did you not, that you did go out with Sherman Wool, is that correct or am I mistaken?

"A No.

"Q You never went out with Sherman Wool?

"A Yes."

ence of unchastity under unknown circumstances might well have little or no probative value in the context of this case. The trial judge of necessity must exercise a delicate discretion in such circumstances. Without an offer of proof which would promise to bring the statement into focus, it cannot be said that the reasons given by the court for the ruling were erroneous. But as already observed, the fact that the statement was inadmissible hearsay and that no foundation was laid for its use as impeachment was an ample independent reason for excluding the statement.

No error was committed by the trial court in excluding this testimony and no citation of authority in support of this conclusion is necessary.

The judgment is affirmed.